## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **JUAN J. TORRES,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 3:19-CV-299-MAB** |
| ) | |
| **BOBBY BLUM and ROB JEFREYS,** ) | |
| **in his official capacity,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is currently before the Court on Plaintiff Juan Torres's motion for partial summary judgment (Doc. 105), and Defendants Bobby Blum and Rob Jeffreys' motions for summary judgment (Docs. 106, 108).

## BACKGROUND

Plaintiff Juan Torres is an inmate of the Illinois Department of Corrections and currently incarcerated at Pinckneyville Correctional Center. In March 2019, he filed a pro se civil rights complaint (Doc. 1). Following a threshold review of the complaint, *see* 28 U.S.C. § 1915A, Plaintiff was permitted to proceed on the following claims:

> Count 1: Bob Blum violated the Eighth Amendment when he was deliberately indifferent to Plaintiff's urinary tract infection in 2018;
>
> Count 2: The Director of IDOC violated the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act ("Rehab Act") by failing to have handicap accessible bathrooms on the yard.

(Doc. 8).

Plaintiff filed a motion seeking summary judgment on his ADA/Rehab Act claim (Doc. 105). Before filing a response in opposition to Plaintiff's motion (Doc. 116), Defendant Rob Jeffreys filed his own motion for summary judgment on the ADA/Rehab Act claim (Doc. 109). Plaintiff filed a response in opposition to Jeffreys' motion for summary judgment (Doc. 117), to which Jeffreys filed a reply (Doc. 120).

Defendant Bob Blum likewise filed a motion for summary judgment on Plaintiff's claim for deliberate indifference (Doc. 106; *see also* Doc. 107). Plaintiff filed a response in opposition (Doc. 118), to which Defendant Blum filed a reply (Doc. 119).

<u>FACTS</u>

Plaintiff Juan Torres has been wheelchair-bound since 2016, due to spine issues and weakness in his right leg (Doc. 105-1, pp. 74, 75; Doc. 105-2). Plaintiff has been incarcerated at Pinckneyville Correctional Center ("Pinckneyville") since December 1, 2017 (Doc. 105-1, pp. 73–74; *see also* Doc. 109-1, p. 1). P

**A.  Deliberate Indifference Claim**

Plaintiff had prostate surgery in 2017 while he was incarcerated at Cook County Jail (Doc. 107-1, pp. 10–11; Doc. 118-4). Since his surgery, Plaintiff uses a catheter to urinate (Doc. 118-4). He must insert the catheter each time he has to urinate and then remove it when he is finished (*Id.*). He also has recurrent urinary symptoms since his surgery, such as blood in his urine, strong-smelling urine, cloudy urine, pain, burning,

and itching with urination (*Id.*).[1] Plaintiff testified that under normal circumstances, he urinates approximately seven times a day and inserting and removing the catheter is painful (*Id.*). When he is experiencing the urinary symptoms, however, he urinates approximately 12-13 times a day and insertion and removal of the catheter is more painful than normal (*Id.*). Plaintiff testified, and medical records corroborated, that in April 2017, when he was experiencing urinary symptoms and his urine culture was positive for E.coli, a physician at Cook County Hospital diagnosed him with a UTI and prescribed antibiotics (ciprofloxacin) (Doc. 118-5).

Plaintiff testified via affidavit that in January 2018, he began experiencing pain, burning, and itching when he urinated, increased urination, and strong-smelling urine (Doc. 118-4). On January 23, 2018, he presented to nurse sick call complaining of "burning [with] urination" (Doc. 107-4, p. 4; *see also* Doc. 107-5, p. 22–23; Doc. 118-4). His vital signs were normal with the exception of his blood pressure (Doc. 107-4, p. 4; Doc. 107-5, p. 24). The nurse, Brenda Gale, had Plaintiff submit a urine sample and she advised him to drink at least eight glasses of water daily (Doc. 107-4, p. 4; Doc. 107-5, p. 22; Doc. 118-4). The urine specimen was sent off to a lab for a urinalysis and culture and sensitivity and the nurse also had the Nurse Practitioner evaluate a urine dipstick that day (Doc. 107-4, p. 4; Doc. 107-5, p. 22; Doc. 118-4).[2] Bob Blum was the Nurse Practitioner at Pinckneyville at

---

[1] Dr. Jasmeet Singh, and outside physician who was involved in Plaintiff's care at Good Samaritan Hospital, testified that individuals who self-catheterize are at increased risk of UTIs because they are repeatedly introducing a foreign entity into the urinary tract (Doc. 107-6, p. 63).

[2] Dr. Singh testified that a dipstick is "sort of a screening tool to analyze urine samples in the office" (Doc. 107-6, p. 39). The laboratory urinalysis provides a more detailed, comprehensive evaluation of a patient's urine sample (*Id.* at pp. 41–42).

this time (Doc. 107-5, p. 34). The results of the dipstick showed a couple abnormalities, specifically, Plaintiff's urine was positive for nitrites and had trace amounts of protein (Doc. 107-4, p. 5; Doc. 107-5, pp. 31–32). Both NP Blum and Dr. Jasmeet Singh testified that the positive nitrites could be a false positive and the dipstick did not definitively identify a UTI (Doc. 107-5, pp. 34–35, 80–81; Doc. 105-6, p. 39).

NP Blum testified that a UTI is not diagnosed based on the results of a urinalysis alone, particularly for someone like Plaintiff who is male and used catheters (Doc. 107-5, pp. 34–35, 80–81). Dr. Singh agreed (Doc. 107-6, pp. 34–35, 39, 100–01). The medical provider must investigate and consider the patient's entire presentation, including the patient's reported urinary symptoms (such as pain or burning when urinating, increased frequency, foul-smelling urine), a urinalysis and urine culture, and findings on physical examination (including fever, abdominal or suprapubic tenderness, or rapid heart rate) (Doc. 107-5, pp. 80–81, 82; Doc. 105-6, pp. 35–36, 68–100–101).

On January 26th, Plaintiff saw NP Blum (Doc. 107-4, p. 8; Doc. 107-5, p. 49). NP Blum noted that Plaintiff had no fever ("afebrile") or rapid heart rate ("not tachycardic"), his abdomen was round, soft, and non-tender, he had positive bowel sounds, and *negative dysuria* (Doc. 107-4, p. 8; Doc. 107-5, pp. 102–03) (emphasis added).[3] NP Blum testified that he recorded "negative dysuria" because that is what Plaintiff reported to him (Doc. 107-5, p. 67). NP Blum stated that did not diagnose Plaintiff with a UTI that day because

_____

[3] Dr. Singh testified that "dysuria" could mean "a number of things[, but] primarily it's used to describe painful urination" (Doc. 107-6, p. 18; *see also id.* at p. 68). NP Blum likewise testified that "dysuria" was "painful urination" (Doc. 107-5. P. 29).

he "did not see a UTI at that time" (*Id.* at p. 68). "When he had negative dysuria, [NP Blum] no longer believed that he had a UTI" (*Id.* at p. 69). But Plaintiff testified that he does not know what "dysuria" means (Doc. 107-2, p. 64). Plaintiff said that he asked NP Blum for the urinalysis results, Blum "checked some paper," and then told him that he "was positive," which Plaintiff assumed to mean that he had a UTI (Doc. 118-4; Doc. 107-2, pp. 39–40). Plaintiff testified that he asked Blum for antibiotics and Blum said no and that he should continue to drink lots of water (Doc. 118-4; Doc. 107-2, p. 40). NP Blum testified that he did not recall telling Plaintiff to drink lots of water, but he probably did (Doc. 107-5, p. 51).

On the same day that Plaintiff saw NP Blum, the University of Illinois faxed the results of the laboratory urinalysis to Pinckneyville (Doc. 107-4, pp. 6–7; Doc. 107-5, p. 37), but apparently the results were not received or reviewed by anyone at the prison for several days (*see* Doc. 107-4, p. 9; Doc. 107-5, pp. 40–41). On January 29th, Plaintiff requested the results of his urinalysis, but they were not yet in his chart (Doc. 107-4, p. 9). Medical staff had possession of the results by the next day (*see id.* at pp. 6–7; Doc. 107-5, pp. 39–41). The results showed that Plaintiff's urine was indeed positive for nitrites, there were trace amounts of protein, his white blood cells were high at 22 (normal range was 0–5), bacteria was present, as was a large amount of leukocyte esterase (Doc. 107-4, pp. 6–7). The culture showed that the bacteria was E.coli and it grew more than 100,000 CFUs (colony form unit) (*Id.*; Doc. 107-6, p. 45). Dr. Singh testified that these results—namely the presence of E.coli, the large leukocyte esterase, and the presence of nitrites—indicate that Plaintiff had a UTI (Doc. 107-6, p. 46).

NP Blum noted on the urinalysis results that he pulled Plaintiff's chart (Doc. 107-4, pp. 6–7; Doc. 107-5, pp. 46, 69–70). Blum testified that he looked at everything from the dipstick onward and concluded Plaintiff's "problem was taken care of . . . the problem was treated by increased water consumption" (Doc. 107-5, pp. 69–70). Blum also testified, however, that he did not independently recall pulling Plaintiff's chart, (*Id.* at pp. 70–71), and he did not record his conclusions anywhere in Plaintiff's chart (*see* Doc. 107-4). There is also no indication that he informed Plaintiff of the results (*see* Doc. 107-4; Doc. 107-5, pp. 70).

Two weeks later, on February 12th, NP Blum saw Plaintiff for a follow-up visit regarding his blood pressure (Doc. 107-4, p. 11). His vital signs were all normal (*Id.*; Doc 107-5, pp. 64–65). The record does not contain any notes regarding urinary symptoms (*see* Doc. 107-4, p. 11; Doc. 107-5, p. 64). NP Blum testified that if Plaintiff reported urinary symptoms, he "believe[s]" he would have recorded those (Doc. 107-5, pp. 64–65). Plaintiff, however, testified that he was still experiencing urinary symptoms, including pain, burning, itching, and foul-smelling urine, and he told Blum about his continuing symptoms, but Blum just told him to keep drinking water (Doc. 107-2, pp. 48–49; Doc. 118-4, p. 4).

On March 8th, Plaintiff had blood drawn for labs and gave a urine sample (Doc. 107-4, p. 12). Plaintiff testified that he was still having urinary symptoms at this time (Doc. 118-4). The results showed Plaintiff's urine was now negative for proteins and nitrites (Doc. 107-4, pp. 13–14). His white blood cells were still out of range but were down to 8 (normal range was 0–5) and the amount of leukocyte esterase was decreased to small (*Id.*).

E.coli bacteria was still present (*Id.*). On March 12th, NP Blum reviewed the urinalysis results (Doc. 107-4, pp. 13–14; Doc. 107-5, pp. 77–78). Once again, Blum did not record his conclusions anywhere in Plaintiff's chart and there is also no indication that he informed Plaintiff of the results (*see* Doc. 107-4). Plaintiff testified that he was never informed of the results (Doc. 118-4).

At his deposition, NP Blum acknowledged there were abnormalities on Plaintiff's urinalysis, but testified they did not "rule in" or "rule out" that Plaintiff had a UTI (Doc. 107-5, pp. 78–80; *see also* Doc. 107-6, pp. 51, 100–01). He said he would need to examine Plaintiff and ask if he was having symptoms to determine if he had a UTI (Doc. 107-5, pp. 81–82). There is no indication, however, that Blum attempted to follow-up with Plaintiff (*see* Doc. 107-4). Dr. Singh testified similarly. She indicated that this urinalysis showed "some abnormal values," including a small number of leukocyte esterase, the presence of bacteria, and a high white blood cell count (Doc. 107-6, p. 51). But other values were negative, including nitrites (*Id.*). She said this urinalysis was "not definitive" and while it "would be helpful in diagnosing [UTI] . . . by itself it's not enough to diagnose UTI" (*Id.*). She also testified that based on this urinalysis, when compared to the urinalysis from January, shows that "the infection is getting better" (Doc. 107-6, p. 54), but was not resolved.

According to NP Blum, the first choice of treatment for a UTI is to drink more water (Doc. 107-5, pp. 90–91). He explained that he was taught "antibiotic stewardship," meaning he should be judicious when prescribing antibiotics to avoid contributing to or exacerbating the problem of antibiotic-resistant bacteria (*Id.*). He testified that he would

only begin treating with antibiotics if "you become tachycardic, have a fever, [or] have leukocytosis on your CBC" (meaning a blood draw showed elevated white blood cells) (*Id.*). NP Blum does not believe antibiotics were the proper treatment for Plaintiff in January 2018 or March 2018 (Doc. 107-5, pp. 87–88). Dr. Singh, however, testified that antibiotics are the first line treatment for a symptomatic bacterial UTI that is confirmed on laboratory tests (Doc. 107-6, pp. 60–64). She further testified that she would never "prescribe just water as a treatment" for such an infection (*Id.* at pp. 63–64). She said water is not a "definitive treatment" but is a supplemental recommendation that can be helpful for a UTI but does not "necessarily treat" the UTI (*Id.* at pp. 61, 63).

There is no indication in the medical records that Plaintiff reported urinary symptoms to any medical provider at the prison in March, April, or May 2018, (*see* Doc. 107-4), however, he testified that he was still experiencing the same symptoms (Doc. 107-2, p. 57; Doc. 118-4). On May 16th, Plaintiff was sent to Pinckneyville Community Hospital after he reported having chest pain (Doc. 107-8, p. 1). Notably, the doctor wrote that Plaintiff was "negative for dysuria, frequency, and urgency." (*Id.* at p. 2). On exam, he was negative for fever but was tachycardic and had "mild abdominal tenderness" in the periumbilical area (*Id.* at p. 3). A urinalysis was done and it showed Plaintiff's urine was cloudy, positive for trace amounts of leukocytes and blood, and had abnormal results for white blood cells, bacteria, and crystals (*Id.* at pp. 4–5). Based on the results of the urinalysis, Plaintiff was given a dose of the antibiotic levofloxacin (Levaquin) before being transferred to Good Samaritan Hospital for further work up of his chest pain (*see id.* at pp. 4, 6, 7).

At Good Samaritan Hospital, Dr. Singh examined Plaintiff upon his arrival (Doc. 107-9, p. 2; Doc. 107-6, pp. 19–20). His pulse was elevated, but he had no fever, his blood pressure, respirations, and oxygen levels were normal, he had "no appreciable suprapubic tenderness," and no abdominal tenderness (Doc. 107-9, p. 2; Doc. 107-6, pp. 77–78). His blood draw showed his white blood cells were within range (*see* Doc. 107-9, p. 2; *see also* Doc. 107-6, p. 78). Dr. Singh testified that Plaintiff did not report dysuria to her (Doc. 107-6, pp. 76–77). No urinalysis was done, Dr. Singh did not diagnose Plaintiff with a UTI and did not prescribe him antibiotics (Doc. 107-6, pp. 79–80). The next day, on May 17th, a second physician saw Plaintiff and noted, in pertinent part, that Plaintiff's urinalysis was positive for white blood cells and bacteria but Plaintiff had no dysuria, no trouble voiding, and no blood in his urine ("hematuria") (Doc. 107-9, pp. 4–5). This doctor also did not diagnose or treat Plaintiff for a UTI (*see id.* at p. 6). On May 18th, a nurse from Pinckneyville Community Hospital spoke to a nurse at Good Samaritan Hospital around 11:15a.m. to inform her that Plaintiff's urine culture had come back positive for E.coli (Doc. 107-8, p. 8). Plaintiff then received an intravenous dose of Levofloxacin, and the doctor ordered one subsequent oral dose of Levofloxacin (Doc. 107-9, pp. 8–10). Plaintiff was discharged from the hospital on May 19th (*Id.* at p. 10). The discharge summary indicates that Plaintiff's hospital stay included treatment for "bladder outlet obstruction/UTI" (*Id.* at p. 11). The doctor notes that Plaintiff's "urine culture came back positive E.coli from Pinckneyville ED. . . . He is having dysuria symptoms for past couple months which is not the base line. He is treated with Levaquin and discharged with Levaquin. No leukocytosis." (*Id.*).

Plaintiff was given his dose of Levaquin as ordered after he arrived back at Pinckneyville (Doc. 107-4, pp. 18–20). He testified that after he received the antibiotics, he felt relief from the urinary symptoms that he had been experiencing since January (Doc. 118-4). According to Plaintiff, he was subsequently diagnosed with a UTI and treated with antibiotics by a medical professional at Pinckneyville in 2019 and 2022 (Doc. 118-4). Neither party provided medical records from those time periods.

**B.  ADA Claim**

There are four yards at Pinckneyville (Doc. 105-3, pp. 11, 12). Major Derek Cleland was a Shift Commander at Pinckneyville, and one of his job duties was setting up schedules, including for the yard, the gym, and the day room (Doc. 105-3, p. 43). He testified that inmates were assigned to yards by housing unit (*Id.* at pp. 25–26). For security reasons, inmates could not request to go to a different yard (*Id.* at pp. 28–29). He further testified that if an inmate did not want to go to the yard, they could stay in their housing unit (*Id.* at p. 37), but they were not allowed to go to the gym instead of the yard (*Id.* at p. 46).

Plaintiff is wheelchair-bound and is housed in an ADA wing at the prison and lives in an ADA cell (Doc. 105-1, pp. 74, 75; Doc. 105-2). On August 4, 2018, Plaintiff attended yard for the first time at Pinckneyville (Doc. 105-1, pp. 84–85; Doc. 105-2, ¶¶4, 6). His cell house wing was assigned to Yard 1 (Doc. 109-3; Doc. 105-3, p. 35). Yard 1 had one toilet (Doc. 105-1, pp. 82, 83; Doc. 105-2, ¶6). When Plaintiff wheeled himself into the Yard 1 restroom to use it, he could not use the toilet because there was no handicap rail for him to use to transfer himself from the wheelchair to the toilet (Doc. 105-1, pp. 87–88;

Doc. 105-2, ¶¶8–10). Because he was unable to lift himself onto the toilet and was unable to stop himself from having a bowel movement, he defecated in his pants in the wheelchair (Doc. 105-2, ¶11). Plaintiff further testified, and Defendant did not dispute (*see* Doc. 116; *see also* Doc. 120), that he had to wait in the yard for approximately one hour and 15 minutes with feces on himself because he could not leave before yard time was over (Doc. 105- 2, ¶¶11, 12). Defendant Rob Jeffreys, the Director of IDOC, admitted, "on August 4, 2018, yard one did not have rails in the bathroom. Defendant admits that rails were not installed in the yard one bathroom until August 29, 2018." (Doc. 29, p. 3).

According to Plaintiff, he did not ask to be taken back to the cell house to use the bathroom or after he defecated on himself because inmates were not allowed to leave the yard until yard time was over (Doc. 105-1, p.103; Doc. 105-2, ¶12). Defendant Jeffreys, however, asserts that Plaintiff was able to ask security staff on the yard to take him back to the cell house to use the restroom (Doc. 109, p. 3, ¶13). Jeffreys cites to Major Cleland's testimony that inmates would be brought back to their housing unit "if there was a need to bring [them] back for a medical reason or any type of reason like that" (Doc. 105-3, p. 49). Major Cleland testified that there was no specific procedure or process, written or otherwise, for wheelchair-bound inmates to request assistance in using the bathroom on the yard or for bringing an inmate back to the cell house from the yard (*Id.* p. 49, 50–51). He said an inmate would be brought back inside only on request, and that request could be made to the yard officer (there was one yard officer for all four yards) (*Id.* at pp. 50, 51). If the request was granted, the "walk staff" would bring the inmate back inside (*Id.* at p. 52). When asked if inmates were notified that they could make a request to come

back to the cell house from the yard, Major Cleland did not provide a straight answer but rather responded, "[t]here was no procedure for that. It would just be if they did request that." (*see id.* at p. 52).

After the incident on August 4, 2018, Plaintiff filed a grievance, indicating that he was unable to use the bathroom on the yard because it was not accessible, and he soiled himself (Doc. 105-5). He asked that the bathroom on the yard be made handicap accessible with rails (*Id.*). The grievance officer's response indicates that, per the ADA Coordinator:

> The only yard with a handicap toilet is yard 4 therefore if an offender goes to yard in a wheel chair he needs to go to yard 4 or be allowed to go back to his yard. . . . The offender is also offered ADA gym which is extra yard time if he does not want to have another accident until more rails are installed.

(*Id.*).

Christine Brown is the Health Care Unit Administrator and ADA Coordinator at Pinckneyville (Doc. 105-4, p. 9–10). Her testimony on the subject of an ADA gym was brief and not entirely clear (*see id.* at pp. 64–65).

> Q: [F]or an offender who is in a wheelchair, would an ADA disability accommodation include grab bars or handrails in a bathroom that the offender could access?
>
> A: Some patients may need handrails, but others -- some other handicaps do not. There may be another reasonable accommodation[s] that could be made. . . . We have a gym line here for those in a wheelchair, and so they could go to a different gym, which is an accommodation. They actually get two yards.
>
> Q; Okay. So could you clarify, please, what you mean by gym line?

A: We have a wheelchair -- actually, it's physical immobility line. And those offenders who are in wheelchairs back in '17, I think it was called physically challenged line. Those that are in wheelchairs or have like an artificial leg, can't maneuver out on the yard, there was a separate yard line or gym line for them so they could go to the gym and exercise and use different equipment that's in the gym above and beyond the yard.

Major Cleland testified that gym time and yard time were scheduled separately, and an inmate would not get both on the same day (Doc. 105-3, p. 40). He further testified that ADA gym is additional time in the gym beyond the regular gym for "physically challenged" inmates "for rehabilitation or to give them more ample time to get into the gym, away from the other population." (Doc. 105-3, p. 55). He testified unequivocally that during the time an inmate was scheduled for yard, they could not opt to go to the gym instead (*Id.* at p. 46). Plaintiff likewise testified that inmates at Pinckneyville did not have such choices (Doc. 105-1, p. 104).

## DISCUSSION

Summary judgment is proper only if the movant shows that there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted). In deciding a motion for summary judgment, the court's role is not to determine the truth of the matter, and the court may not "choose between competing inferences or balance the relative weight of conflicting

evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014) (citations omitted); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). Instead, "it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Hansen*, 763 F.3d at 836.

## A.   COUNT 1 – DELIBERATE INDIFFERENCE

To succeed on a claim of deliberate indifference, the plaintiff must demonstrate that he suffered from an "objectively serious medical condition" that the defendant responded to with a "sufficiently culpable state of mind," namely deliberate indifference. *Goodloe v. Sood*, 947 F.3d 1026, 1030, 1031 (7th Cir. 2020) (citing *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016)). Defendant Blum does not argue that Plaintiff's medical condition was not objectively serious (*see* Doc. 107, p. 18). Therefore, Plaintiff's claim turns on the subjective component and whether he has created a genuine issue of fact as to whether NP Blum responded with deliberate indifference to his complaints of urinary symptoms.

Deliberate indifference requires the plaintiff to show that the prison official knew of or was aware of a serious risk to the prisoner's health, but they consciously disregarded that risk. *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). In other words, "[t]he defendant must know facts from which he could infer that a substantial risk of serious harm exists and he must actually draw the inference." *Rasho v. Elyea*, 856 F.3d 469, 476 (7th Cir. 2017) (quoting *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016)). Deliberate indifference "is a high bar 'because it requires a showing [of] something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Rasho v. Jeffreys*, 22

F.4th 703, 710 (7th Cir. 2022) (quoting *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012)).

"[M]ere negligence" or even civil "objective recklessness" simply "is not enough." *Petties*,

836 F.3d at 728. *See also McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013) ("Deliberate

indifference is not medical malpractice.").

In the context of medical professionals, the deliberate indifference standard has

been described as the "professional judgment standard." *Sain v. Wood*, 512 F.3d 886, 895

(7th Cir. 2008). Treatment decisions are entitled to deference so long as they are based on

professional judgment, meaning they are "fact-based with respect to the particular

inmate, the severity and stage of his condition, the likelihood and imminence of further

harm[,] and the efficacy of available treatments." *Roe v. Elyea*, 631 F.3d 843, 859 (7th Cir.

2011); *Rasho v. Elyea*, 856 F.3d at 476.

> By definition a treatment decision that's based on professional judgment
> cannot evince deliberate indifference because professional judgment
> implies a choice of what the defendant believed to be the best course of
> treatment. A doctor who claims to have exercised professional judgment is
> effectively asserting that he lacked a sufficiently culpable mental state, and
> if no reasonable jury could discredit that claim, the doctor is entitled to
> summary judgment.

*Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Zaya*, 836

F.3d at 805).

"But deference does *not* mean that a defendant automatically escapes liability any

time he invokes professional judgment as the basis for a treatment decision." *Zaya*, 836

F.3d at 805 (emphasis in original). "[W]here evidence exists that the defendant knew

better than to make the medical decision that he did, then summary judgment is

improper." *Whiting*, 839 F.3d at 662 (citation omitted). The Seventh Circuit has identified

a variety of circumstances that can permit a jury to reasonably infer deliberate indifference. *Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022) (citing *Petties*, 836 F.3d at 729–30). In particular, deliberate indifference can be inferred when a doctor failed to act in the face of an obvious risk, made a treatment decision that is "a substantial departure from accepted professional judgment, practice, or standards," continued ineffective treatment, or chose "an easier and less efficacious treatment." *Brown*, 38 F.4th at 550; *Petties*, 836 F.3d at 729–30. *See also Roe*, 631 F.3d at 857 ("[W]e have stated that a medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances.") (citation omitted).

In this instance, the Court has little trouble concluding that Plaintiff established a material issue of fact as to whether NP Blum was deliberately indifferent to his UTI. Plaintiff reported urinary symptoms on January 23, 2018, and laboratory analysis of a urine specimen taken that day definitively showed that he had a urinary tract infection. While NP Blum testified that by the time he got the laboratory analysis on January 30th, he believed Plaintiff's infection had resolved itself because Plaintiff had reported a couple days prior that he was experiencing "no dysuria." But a reasonable factfinder could easily choose to discredit NP Blum's explanation.

To begin with, there is evidence that NP Blum's decision not to prescribe antibiotics conflicted with standard treatment protocols. Dr. Singh that the standard protocol for treating a symptomatic UTI that is confirmed through urinalysis is antibiotics. Water is not going to cut it, and she would never treat a confirmed UTI with

only water. Furthermore, Plaintiff submitted evidence that on four other occasions when he experienced urinary symptoms, he was treated with antibiotics. A reasonable jury could conclude from this evidence that NP Blum's decision not to prescribe antibiotics went beyond a mere difference of opinion between practitioners and instead evidenced a decision that was blatantly inappropriate and "far afield of accepted professional standards." *See Petties*, 836 F.3d at 729 (failure to follow standard treatment protocols can support an inference of deliberate indifference); *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("A prisoner may establish deliberate indifference by demonstrating that the treatment he received was 'blatantly inappropriate.'") (citation omitted); *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) ("To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment."); *Steele v. Choi,* 82 F.3d 175, 179 (7th Cir.1996) ("If the symptoms plainly called for a particular medical treatment—the leg is broken, so it must be set; the person is not breathing, so CPR must be administered—a doctor's deliberate decision not to furnish the treatment might be actionable under § 1983.").

Furthermore, the accuracy of NP Blum's "no dysuria" notation on January 26th is questionable. All we know is that Blum wrote "no dysuria," and Plaintiff does not know what "dysuria" means. Blum could not independently recall the visit or offer any details about the genesis of that notation. If leaves the Court wondering what questions Blum asked Plaintiff and how far Blum went to elicit information from Plaintiff about his urinary symptoms. In other words, was this a cursory examination or did Blum actually

make a real effort to clarify whether Plaintiff's symptoms had in fact dissipated. There is no evidence that Blum made any effort to follow-up with Plaintiff after he received the lab report even though Plaintiff had recently requested the results. A reasonable factfinder might find it telling that Plaintiff asked for the results (more than once if his testimony is believed). It could signify that he was still experiencing symptoms and wanted to know if the urinalysis confirmed the cause. Similarly, a reasonable factfinder could find it telling that Plaintiff requested antibiotics from Blum (if his testimony is believed). This could signify that he was still experiencing symptoms and looking for relief. "An official may not escape liability by 'refus[ing] to verify underlying facts that he strongly suspect[s] to be true.'" *Conley v. Birch*, 796 F.3d 742, 747 (7th Cir. 2015) (quoting *Farmer*, 511 U.S. at 843 n. 8).

A material question of fact also exists as to whether NP Blum's actions after January 30th evidence deliberate indifference. When Plaintiff saw Blum on February 12th, Blum knew that the laboratory urinalysis demonstrated Plaintiff had a UTI, and Plaintiff testified that he told Blum he was still experiencing urinary symptoms. It is undisputed that Blum still did not prescribe Plaintiff any antibiotics. Rather, Plaintiff says that Blum told him to keep drinking water. This testimony, if believed, could give rise to an inference that NP Blum continued to ignore standard treatment protocols and persisted in an ineffective course of treatment.

Then Plaintiff had a second urinalysis done in March 2018. Blum highlights that these results supposedly showed the infection "was improving" and therefore "there was no medical reason to change course and give Plaintiff an antibiotic" (*see* Doc. 107, pp. 18,

21). But crucially, the urinalysis results could also be read to mean that the infection still had not completely resolved some six weeks later—that a water-only course of treatment obviously had not worked. But Blum took no action to address the possibility of a lingering UTI. He did not follow-up with Plaintiff or otherwise investigate whether Plaintiff was still having urinary symptoms. He just assumed Plaintiff was not. A reasonable factfinder could easily conclude that Blum acted with deliberate indifference.

For these reasons, the Court concludes that Plaintiff's claim of deliberate indifference survives summary judgment.

## B. COUNT 2 – VIOLATION OF THE ADA/REHAB ACT

Both the ADA and the Rehab Act prohibit discrimination against the disabled. *CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014); 42 U.S.C. §12132; 29 U.S.C. § 794(a). Because the two statutes, as well as the federal regulations implementing them, are "materially identical," they are interpreted and applied in a consistent manner. *A.H. by Holzmueller v. Illinois High Sch. Ass'n*, 881 F.3d 587, 592 (7th Cir. 2018) (citing *Steimel v. Wernert*, 823 F.3d 902, 909 (7th Cir. 2016)).[4] For the sake of ease, the Court refers only to the ADA throughout the course of the analysis, but the analysis applies to both the ADA and Rehab Act claims, unless otherwise stated.

To succeed on his claim of disability discrimination, Plaintiff must prove three basic elements: (1) he was a qualified individual with a disability; (2) he was excluded

---

[4] The only notable difference is that the Rehab Act includes as an additional requirement the receipt of federal funds, but this element is incontrovertible because all states accept it for their prisons. *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015); *Jaros v. Illinois Dep't of Corr.*, 685 F.3d 667, 671–72 (7th Cir. 2012).

from or denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination; and (3) the exclusion, denial of benefits, or discrimination was because of his disability. *Shuhaiber v. Illinois Dep't of Corr.*, 980 F.3d 1167, 1170 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 2475 (2021) (citing *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015)). Furthermore, in order for Plaintiff to recover compensatory damages, he must show "intentional conduct (and not mere negligence)" which has been interpreted to mean he must show the defendant "acted with deliberate indifference to rights conferred by the ADA and Rehabilitation Act." *Shaw v. Kemper*, 52 F.4th 331, 334 (7th Cir. 2022) (citations omitted). *See also Hildreth v. Butler*, 960 F.3d 420, 431 (7th Cir. 2020) (quoting *Lacy v. Cook County, Illinois*, 897 F.3d 847, 862 (7th Cir. 2018)).

It is well-established that the IDOC is a public entity within the meaning of the ADA and has always been subject to the nondiscrimination and accessibility requirements of Title II. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (per curiam). The IDOC does not contest that Plaintiff was a qualified individual with a disability (*see* Docs. 109, 116). The IDOC likewise does not contest that a toilet is a service and that the toilet on the yard was not handicap accessible (*see* Docs. 109, 116). *See Shaw v. Kemper*, 52 F.4th 331, 334 (7th Cir. 2022) (that "a handicapped-accessible toilet for disabled prisoners amounts to a service," the denial of which could establish a claim under both the ADA and the Rehab Act. (citing *United States v. Georgia*, 546 U.S. 151, 157 (2006)). Furthermore, it is self-evident that Plaintiff unable to use the toilet because of his disability. *See* 42 U.S.C. § 12132; 29 U.S.C. § 794(a); *Wisconsin Community Services v. City of Milwaukee*, 465 F.3d 737, 752 (7th Cir. 2006) (To establish this element, Plaintiff must

"show that, 'but for' his disability, he would have been able to access the services or benefits desired."). Defendant Jeffreys nevertheless argues that no discrimination occurred because the prison provided Plaintiff with reasonable accommodations (Doc. 109, pp. 5–6).

The ADA and the Rehab Act not only prohibit prisons from intentionally discriminating against disabled inmates, but they also require the prisons to make "reasonable accommodations" or "reasonable modifications" to their polices and practices to avoid denying inmates a service on account of their disability. *Shaw v. Kemper*, 52 F.4th 331, 334 (7th Cir. 2022). It is well established that a failure to make 'reasonable modifications in policies, practices, or procedures' can constitute discrimination . . . ." *Lacy v. Cook Cty., Illinois*, 897 F.3d 847, 853 (7th Cir. 2018). *See also Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012) ("Refusing to make reasonable accommodations is tantamount to denying access."). Structural barriers that impede access by persons with disabilities to public services are "[p]erhaps the most obvious example of . . . discrimination." *Lacy*, 897 F.3d at 853. *See also* 28 C.F.R. § 35.149 (disabled individuals cannot be excluded from or denied the benefits of the public entity's services, programs, or activities because the entity's "facilities are inaccessible to or unusable by individuals with disabilities."); *Tennessee v. Lane*, 541 U.S. 509, 531 (2004) ("Congress required the States to take reasonable measures to remove architectural and other barriers to accessibility.").

Facilities like Pinckneyville that were built or altered after January 26, 1992—which was the effective date of the ADA—must be "readily accessible to and usable by

individuals with disabilities," meaning they must comply with specific structural accessibility standards.[5] *Lane*, 541 U.S. at 532; *Lacy*, 897 F.3d at 853; 28 C.F.R. §§ 35.151(a)(1), (b)(1). *See also Hummel v. St. Joseph Cty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) ("For public facilities built or altered after January 26, 1992, the public entity must ensure that the facility is not just possibly accessible but 'readily accessible.'"). When it comes to toilets, the accessibility standards dictate things such as the height of the toilet, the location and height of grab bars, and the amount of clear floor space. 1991 Standards § 4.1.2(6).[6] "Departures" from the accessibility standards "by the use of other methods" are only permitted "when it is clearly evident that equivalent access to the facility . . . is thereby provided."

### 1. Defendant Jeffrey's Motion for Summary Judgment

Defendant Jeffreys argues that the IDOC did not violate the ADA because Plaintiff was provided with reasonable accommodations (Doc. 109, p. 6). Specifically, Jeffreys claimed that Plaintiff could be brought back in from the yard to use the indoor toilet or Plaintiff could use the ADA gym, where the toilet was accessible (Doc. 85, p. 14). The Court is unpersuaded by this argument.

---

[5] Pinckneyville Correctional Center opened in October 1998. ILL. DEP'T. OF CORR., *Pinckneyville Correctional Center,* https://idoc.illinois.gov/facilities/allfacilities/facility.pinckneyville-correctional-center.html (last visited March 28, 2023).

[6] The Department of Justice issued the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (ADAAG) in 1991 ("the 1991 Standards"), and they were revised in 2010. *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1076 (7th Cir. 2013). Given that Pinckneyville was opened in 1998, the 1991 Standards should be used to determine compliance. 28 C.F.R. § 35.151(c)(1). The 1991 Standards are available at https://www.ada.gov/1991standards/adastd94-archive.pdf.

It is undisputed on August 4, 2018, the toilet on Yard 1 was not handicap accessible because it did not have grab bars. Thus, the Court can only conclude the IDOC did not comply with the specific requirements set forth in the accessibility standards. 28 C.F.R. § 35.151(c)(1). Deviating from the accessibility standards is only permitted if it is "clearly evident that equivalent access" to the facility was provided. 28 C.F.R. § 35.151(c)(1). Even if the "equivalent access" provision applies to architectural accommodations, *but see Clemons v. Dart*, 168 F. Supp. 3d 1060, 1067 (N.D. Ill. 2016), Defendant made no effort to explain how the accommodations provided at Pinckneyville provided equivalent access, and there are material issues of fact surrounding the purported accommodations. While Major Cleland and Christine Brown both provided very general testimony that Plaintiff could have asked to be brought back inside from the yard to use the toilet, there is no evidence that Plaintiff (or any other inmates) were notified of this option. Plaintiff explicitly testified that he could not ask to come inside. There is also no evidence as to where the "yard officer" is located or how an inmate would go about getting the officer's attention and making their request. There is no evidence as to how long a disabled inmate might have to wait before being escorted back to the cell house. And there is no evidence as to whether the inmate would be allowed to return to the yard after using the bathroom indoors.

Furthermore, case law indicates that equivalent access does not exist if disabled inmates have to request assistance from a guard to use the bathroom while non-disabled inmates can freely use the bathroom as needed without notifying a guard. *See Dunmore v. Shicker*, No. 16-CV-171-MAB, 2020 WL 65057, at *15 (S.D. Ill. Jan. 7, 2020) (holding that

reasonable jury could easily conclude disabled inmates did not have equivalent access to toilet while on the yard where they had to get a guard to escort them back into cell house but non-disabled inmates could use a porta potty); *Clemons v. Dart*, 168 F. Supp. 3d 1060, 1066 (N.D. Ill. 2016) (holding inmate did not have equivalent access to the jail's toilets and showers when he was housed in non-ADA-compliant cell but had access to around-the-clock nursing care because "the availability of staff assistance upon request does not constitute equivalent access" under Title II); *Roberts v. Dart*, No. 16 C 5560, 2018 WL 1184735, at *4 (N.D. Ill. Mar. 7, 2018) (holding inmate did not have equivalent access to the toilets at the jail when he was housed in non-ADA-compliant cell but could ask officers to let him out of his cell to use the toilet in the dayroom); *Tyler v. City of Manhattan*, 857 F. Supp. 800, 819 (D. Kan. 1994) (finding arrangement where disabled individual was required to request a key to use the only accessible bathroom did not comport with Title II).

As for using the ADA gym instead of the yard, its readily apparent that an indoor gym cannot be considered equivalent to the outdoor recreation yard. At any rate, the IDOC did not provide any evidence regarding the frequency and duration of the trips per week to the ADA gym for disabled inmates as compared to the outdoor yard for non-disabled inmates. Consequently, there is a dearth of evidence from which the Court could conclude the ADA gym provided equivalent access.

For these reasons, Defendant Jeffreys is not entitled to summary judgment on Plaintiff's ADA/Rehab Act claim, and this aspect of the motion is denied.

As for the issue of damages, Defendant Jeffreys argues that he is entitled to summary judgment on Plaintiff's claim for injunctive relief because Plaintiff is not entitled to any injunctive relief given that handrails were installed in the restroom in question on August 29, 2018 (Doc. 109, pp. 7–8). While Plaintiff does not contest Defendant's argument (*see* Doc. 117), the Court is not convinced that injunctive relief is a moot issue. The evidence demonstrates that the housing units at Pinckneyville are assigned to the various yards on a rotating basis (Doc. 105-3, p. 54; *see also* Doc. 109-3). That means Plaintiff's housing unit attends Yards 1, 2, 3, and 4. The Court therefore believes that Plaintiff's claim for injunctive relief would only be moot if there was evidence that the bathrooms on all four yards are accessible, not just in "the restroom in question" on Yard 1. While there is evidence that the bathroom on Yard 1 is now accessible, and it seems that the bathroom on Yard 4 is also accessible, Defendant did not point to any evidence regarding the bathrooms on Yards 2 and 3. Consequently, the Court is not prepared to enter summary judgment for Defendant on Plaintiff's request for injunctive relief, or even to declare that request moot.

With respect to compensatory damages, as mentioned previously, Plaintiff must show prison officials acted with deliberate indifference, meaning they "*knew* that harm to a federally protected right was substantially likely and . . . *failed* to act on that likelihood." *Hildreth*, 960 F.3d at 431 (quoting *Lacy*, 897 F.3d at 862). Defendant argues that Plaintiff cannot establish deliberate indifference because there is no evidence that Plaintiff or any other inmate informed any prison official that the bathroom on Yard 1 was not accessible (Doc. 109, p. 9), seemingly implying that Plaintiff cannot establish the

knowledge requirement of deliberate indifference. This argument is a non-starter.

A plaintiff can satisfy the knowledge element of the deliberate indifference test by showing that she "alerted the public entity to [their] need for accommodation or . . . the need for accommodation is obvious or required by statute or regulation." *Updike v. Multnomah Cnty.,* 870 F.3d 939, 951 (9th Cir. 2017) (internal parentheses omitted); Accord *Havens v. Colo. Dep't of Corr.*, 897 F.3d 1250, 1266 (10th Cir. 2018) (similar); *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1147 (11th Cir. 2014) (similar); *Carter v. City of Chicago*, 520 F. Supp. 3d 1024, 1033 (N.D. Ill. 2021) (citation omitted). *See also Farmer v. Brennan*, 511 U.S. 825, 842 (1994) ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.")

Here, by the time Plaintiff tried to use the toilet on the yard in August 2018, the law was very well-settled for nearly three decades that Pinckneyville could not provide a toilet on the yard for only non-disabled inmates. They also had to provide an accessible toilet for disabled inmates, like Plaintiff. *See, e.g., Ashby v. Warrick Cty. Sch. Corp.*, 908 F.3d 225, 232 (7th Cir. 2018) ("The mandate of Title II . . . is clear: whenever a public entity or federal funding recipient 'does . . . anything,' it must extend 'the benefits of,' and cannot 'discriminat[e]' in, that thing on the basis of disability."); *Frame v. City of Arlington*, 657 F.3d 215, 226 (5th Cir. 2011) ("[W]hen a city decides to build or alter a sidewalk but makes that sidewalk inaccessible to individuals with disabilities without adequate justification, the city discriminates within the meaning of Title II. Such a sidewalk benefits persons without physical disabilities, yet that benefit is unnecessarily denied to similarly situated persons with physical disabilities."); *Chisolm v. McManimon*, 275 F.3d 315, 329 (3d Cir.

2001) ("To the extent that other, non-disabled inmates had access to communication by telephone, MCDC was required to provide Chisolm with such access on nondiscriminatory terms.") Pinckneyville was obviously aware of the accessibility requirements for toilets because it is undisputed that the toilet in Plaintiff's ADA cell met those requirements. Yet, for whatever reason, Pinckneyville officials chose not to comply with the accessibility standards for the toilets on the yards, even though disabled inmates were assigned to those yards. Jeffreys cannot escape liability now by arguing that the prison was unaware the toilet was inaccessible because no wheelchair-bound prisoner had told prison officials. The prison had a duty to ensure that the outdoor toilet complied with the requirements of the federal regulations and the accessibility standards from the moment that it was constructed/installed. And the prison apparently ignored the requirements of federal law.

For these reasons, Defendant Jeffreys' motion for summary judgment as to Plaintiff's ADA/Rehab Act claim is denied in its entirety.

### 2. Plaintiff's Motion for Summary Judgment

Plaintiff's motion does not suffer from the same infirmities that Defendant Jeffreys' does. He has demonstrated that there is no material issue of fact as to whether he was denied a service of the prison because of his disability. It is undisputed on August 4, 2018, the toilet on Yard 1 did not have grab bars and therefore the IDOC failed to comply with the structural accessibility standards that it was bound by. 28 C.F.R. § 35.151(c)(1). It is likewise undisputed that without grab bars, it was impossible for Plaintiff to use the toilet, and therefore it is self-evident that Plaintiff was denied a service of the prison

because of his disability. And Defendant has failed to show "clear evidence" that "equivalent access" to the bathroom was provided for disabled inmates. *See* 28 C.F.R. 35.151(c)(1). Defendant's only argument is that while Plaintiff could not access the toilet on the yard, he could have asked a guard to take him back into the cell house to use the indoor toilet or he could have attended ADA gym. Defendant did not provide any details about these two options (*see* Doc. 116; *see also* Doc. 109). As such, there is no evidence from which a reasonable jury could find that disabled inmates were given equivalent access to the bathroom. Consequently, Plaintiff is entitled to summary judgment on his ADA/Rehab Act claim.

Plaintiff has also demonstrated there is no material issue of fact as to whether the IDOC was deliberately indifferent. By the time Plaintiff tried to use the toilet on the yard in August 2018, the law was very well-settled that if only one toilet was provided on the yard, it had to be accessible to disabled inmates. The prison could not provide a toilet on the yard for only non-disabled inmates. Yet Pinckneyville did just that. Defendant Jeffreys tries to escape liability by arguing that Plaintiff "[did] not provide any evidence that Defendant knew on August 4, 2018 that there were no hand rails in the bathroom of Yard 1" (Doc. 116, p. 4). But this argument misses the point. As stated above, the toilet was constructed/installed after 1992 and therefore the prison had an affirmative obligation to ensure that it complied with accessibility standards from the moment it was constructed. The prison is not allowed to ignore that requirement until a disabled prisoner complains. Even construing the facts in a light most favorable to Defendant, no reasonable jury could find in his favor. Plaintiff is entitled to summary judgment on the

issue of deliberate indifference and he may collect compensatory damages, the amount of which is to be determined by the trier of fact.

## CONCLUSION

Defendant Bobby Blum's motion for summary judgment as to Count 1 for deliberate indifference (Doc. 106) is **DENIED.** Defendant Rob Jeffreys' motion for summary judgment as to Count 2 for violations of the ADA and Rehab Act (Doc. 108) is **DENIED.** Plaintiff's motion for summary judgment as to Count 2 (Doc. 105) is **GRANTED.**

This matter shall proceed to trial on Plaintiff's claim for deliberate indifference (Count 1), and on the issue of damages as to Plaintiff's claim for violations of the ADA and Rehab Act (Count 2).

A status conference to discuss the trial schedule and the utility of a settlement conference will be set by a separate Order.

**IT IS SO ORDERED.**

**DATED: March 31, 2023**

**s/ Mark A. Beatty**
**MARK A. BEATTY**
**United States Magistrate Judge**